**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 21-CR-310-1 (ABJ)** |
| | : | |
| **JOSHUA WAGNER,** | : | |
| | : | |
| *Defendant.* | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Joshua Wagner to 30 days in custody, 36 months of probation, and $500 in restitution.

## I.    Introduction

Wagner participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the Congressional certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million of property damage.

Wagner stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law-enforcement officers, breach the Capitol, and disrupt the certification proceedings. But for his actions and those of so many others, the riot likely would have failed to cause that disruption.

The government is requesting a split sentence of 30 days of incarceration and 36 months of probation based on an assessment of relevant sentencing factors. Wagner traveled from Indiana and unlawfully entered the Capitol with his friend and codefendant Israel Tutrow.[1] Wagner recorded videos on his cellphone that captured him and Tutrow walking to and inside the Capitol. In the Capitol Crypt, a U.S. Capitol Police ("USCP") officer admonished Wagner to stay in the center of the Crypt. When Wagner disregarded that command and the officer needed to tell him to move a second time, Wagner responded, "This is our house," and then moved. Wagner made numerous belligerent statements to others and engaged in profane rhetoric on the Capitol grounds and inside the Capitol. He repeatedly exhorted other rioters to "[h]old [their] positions" and the "perimeter" and not to leave the Capitol grounds—effectively expressing his desire that the overall attack on the Capitol continue—and wondered aloud why other rioters did not bring "ARs[2] and shit" to the Capitol because "we could literally take it over right now." At one point, Wagner told Tutrow that they should "hold" their ground at the Capitol because Wagner believed "people are gonna show up with weapons now." He also joined in a chant of "fuck Joe Biden" and suggested that rioters barricade themselves inside the Crypt. At the Capitol, Wagner characterized the police officers defending the building as committing "treason," being "traitors," and engaging in "tyranny." At another point, he directly asked an officer whether he was "on our side." After

---

[1] Like Wagner, Tutrow pleaded guilty to one count of parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). On December 21, 2021, this Court sentenced Tutrow to 36 months of probation, the first 60 days to be served in home detention, along with other conditions.

[2] This is likely a reference to the "AR-15" lightweight semi-automatic rifle. AR-15 style rifles have played a prominent role in many high-profile mass shootings in the United States. *See* https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2021-06-13/.

leaving the Capitol Building, he urged his fellow rioters not to fight among themselves, but to go inside the Capitol if they wanted to fight, presumably with the police.

Within days of becoming aware he was under investigation, Wagner admitted to an acquaintance he made a mistake by entering the Capitol, and expressed regret and a willingness to cooperate with federal authorities through an attorney.  He consented to allow the FBI to search his cellphone.  He promptly accepted responsibility after the government tendered a plea offer.

## II.   <u>Factual and Procedural Background</u>

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 41 at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### *Wagner's Role in the January 6, 2021, Attack on the Capitol*

Wagner drove from Indiana with his friend Israel Tutrow and another individual to attend the rally President Donald Trump planned to hold in Washington, D.C., on January 6, 2021. According to the other individual who accompanied Wagner and Tutrow, they arrived in Washington that day too late to attend the rally, so the three of them joined many others in a long walk to the Capitol.

Around 1:30 p.m., Wagner began recording videos on his cellphone that captured his first-person perspective.  At one point, he turned the cellphone camera on himself and took this photo:



Wagner enthusiastically joined in and started chants of "U.S.A.," "four more years," "defend our rights," "stop the steal," "fight for Trump," and "drain the swamp" with others walking to the Capitol.  Around this time, others were yelling angry statements and chanting things like "fuck Antifa."  Wagner said to Tutrow, "Oh shit, dude – it's gonna get real, Iz."  As Wagner saw many others also proceeding to the Capitol, he commented, "This is Trump's army, dude."  He also asked Tutrow, "You think shit's really gonna get fucking real here today, dude?  Maybe, bro?"  Tutrow replied, "Yeah."  Tutrow observed that some walking to the Capitol were carrying baseball bats, to which Wagner responded, "Dude, I don't care, bro."

As they continued walking on Pennsylvania Avenue, N.W., near Freedom Plaza, Wagner remarked, "We're almost there, dude.  You see it?  Capitol Hill, dude."  As they drew closer to the Capitol, Wagner told Tutrow and another individual, "We should walk in the floor, dude. . . . Floor on the Senate, dude. . . .  You think we could? . . .  Dude, they would be scared, dude."  At some point at or near the Capitol, Wagner and Tutrow became separated from each other.

Around 2:59 p.m., Wagner joined a large group of people singing the National Anthem facing a defensive line of officers wearing riot gear on the Capitol grounds. Some in the crowd chanted or yelled "our house" and "we pay you" at the officers. Seconds after one person muttered "fucking traitors," Wagner shouted, "That's treason right there." As some in the crowd appeared to be leaving the area, Wagner exhorted them to "[h]old your positions. We will lose our ground if . . . we keep retreating back. We will occupy this ground for as long as we can."[3]

A short time later, Tutrow reunited with Wagner outside the Capitol.[4] Tutrow admitted he had entered the Capitol. Wagner asked if Tutrow had fought the police. Tutrow said he had not, but heard "they shot a girl in the neck" inside the building. Wagner responded, "They're traitors, dude." He also said to Tutrow, "Why does no one have ARs and shit, dude? . . . Dude, we could literally take it over right now, dude." Tutrow then admitted that when he entered the Capitol, "I had my knife on me. I'm not—I'm not gonna get in trouble, am I?" Wagner advised him not to get "grapple[d]," and opined, "I don't think no one's really getting arrested – they're just pushing back. They can't detain people because there's not enough cops to secure a perimeter." Gov't. Exh. 1 at 02:50-03:38.

Wagner and Tutrow walked to another area on the Capitol grounds, closer to the building. He then repeatedly and loudly exhorted his fellow rioters to resist the efforts of the police to remove them from the restricted area. Wagner said, "We're holding, dude. We're gonna be here all night, dude," and yelled, "Stop the tyranny." As some individuals walked down a ramp and

---

[3]  This activity is captured in one of Wagner's cellphone videos—file name "20210106_145908.mp4," which is marked as Government Sentencing Exhibit 1 ("Gov't. Exh. 1")—at 00:00-02:38.

[4]  Upon further review of the content and metadata from Wagner's cellphone videos, it appears that Tutrow initially entered the Capitol without Wagner, then reentered the building sometime around or after 3:00 p.m.

away from the building, Wagner told them, "Hey – we need to hold.  We can't let them gain more ground, dude."  Wagner then turned to Tutrow and said, "Dude, we gotta hold, bro.  I feel like people are gonna show up with weapons now."  Wagner trained his cellphone camera on the defensive line of officers in riot gear again, and said loudly, "Tyranny right in front of my eyes."  Wagner turned back to others and said, "We hold.  We hold as long as we can."  He shouted,  "This is our home.  We are the land of the free and the brave."  *Id.* at 03:39-05:20.

Wagner continued observing others walk away as if to leave the Capitol grounds.  He complained to Tutrow, "Dude, people are being cowards right now, dude.  They're leaving.  Dude, people are being pussies, bro."  He yelled, "Save our country," and said loudly to the crowd, "Don't let 'em gain more ground.  We gotta hold the perimeter, dude.  They'll start pushing when people leave."  Wagner asked another man, "Did they tear gas you, bro?"  The other man replied, "Way down low on the steps."  Wagner responded, "That's why I'm wearing my mask."  Wagner shouted to the crowd, "Don't go back!  Hold the ground!"  *Id.* at 05:25-06:44.

At approximately 3:10 p.m., Wagner entered the Capitol near the Senate Wing Door.  These sequential screenshots from Capitol surveillance video depict Wagner (circled in red) climbing in through a broken window and standing near the Senate Wing Door:





Around 3:23 p.m., Wagner recorded a video of himself and Tutrow inside an area known as the Capitol Crypt.   At one point, a USCP officer told Wagner to move near the center of the space.   When some rioters began screaming chants of "U.S.A.," Wagner and Tutrow joined them.

Wagner then joined a chant of "fuck Joe Biden," which he repeated at least five times.[5]   Around 3:26 p.m., as Wagner moved about the Crypt, the same officer who had earlier directed him to stay toward the center of the space again ordered Wagner to move.  Wagner responded, "This is our house."   The officer admonished Wagner, "I'm asking you nicely, you need to stay towards the middle."  Shortly after that, Wagner moved toward the center and told others, "We need to start barricading so they can't enter."[6]

At approximately 3:29 p.m., Wagner proceeded to a corridor leading to the Senate Wing Door through which other rioters were leaving the building.  An officer asked Wagner to "make his way out," and Wagner said he was.  As other officers directed Wagner toward the exit, Wagner said, "I'm gonna be back."  While waiting in the logjam of individuals attempting to leave, Wagner asked one of the officers who had been conversing with another rioter, "I know you're doing your job, but really, are you on our side? . . .  The people, . . . not Congress?"  He told the officer, in a conversational tone, "You were sworn to take an oath to protect this country from enemies foreign and domestic."  The officer responded, "That's right, we gotta figure out how to do that."  Wagner continued walking toward the exit.[7]

As Wagner approached the Senate Wing Door, alarms continuously sounded in the background.  Instead of exiting through the doorway itself, where some individuals were standing,

---

[5]    This activity is captured in one of Wagner's cellphone videos—file name "20210106_152342.mp4," which is marked as Government Sentencing Exhibit 2—at 00:00-01:42.

[6]    This activity is captured in one of Wagner's cellphone videos—file name "20210106_152639.mp4," which is marked as Government Sentencing Exhibit 3—at 00:00-00:44.

[7]    This activity is captured in one of Wagner's cellphone videos, file name "20210106_152933.mp4," which is marked as Government Sentencing Exhibit 4 ("Gov't Exh. 4")—at 00:00-03:50.

Wagner climbed out through a broken window beside the doorway.  Gov't Exh. 4 at 03:51-05:40.

Shards of glass and debris lay on the tile floor beneath the window, as depicted in this screenshot

from Wagner's video:



Capitol surveillance video showed Wagner approaching that window to exit the Capitol

at approximately 3:35 p.m., as depicted below (circled in yellow):



Another image of Wagner approaching that exit is shown below:



Once he was outside the building, Wagner told other rioters, "They're approaching the perimeter. I mean, not with weapons or anything. . . . They're not . . . physically fighting anybody. . . . I just been here forever, you know. I'm gonna come back. . . . Hold the perimeter. Trump's calling in the National Guard, I think." As Wagner walked a little farther, he shouted three times, "Let's stop paying our taxes." He encountered a woman fighting with another rioter. After others told the woman and other rioter to stop, Wagner yelled, "We are all Americans here. . . . That's

our enemy in there, not here.  Not between us.  You wanna fight, you can go in there and fight."
*Id.* at 05:45-07:29.

Within hours of the Capitol riot, the Federal Bureau of Investigation ("FBI") widely disseminated a "be on the lookout" notice ("BOLO") asking for the public to assist in identifying individuals who engaged in unlawful conduct at the Capitol on January 6, 2021.  After seeing himself pictured as one of the suspects of interest in the BOLO, Wagner, through an attorney, contacted federal authorities on January 9, 2021, and identified himself as someone who had unlawfully entered the Capitol.  Wagner's attorney said that Wagner regretted his actions on January 6 and was willing to cooperate and be interviewed once a prosecutor was assigned to the case.  Wagner also gave consent to the FBI to search the cellphone on which he recorded videos at the Capitol.   On January 26, 2021, he self-surrendered to the FBI and was fully cooperative during his arrest.  The lead FBI agent observed that during his self-surrender, Wagner cried and appeared regretful.  Ultimately, the FBI did not interview Wagner.  During the presentence investigation, Wagner's mother told the U.S. Probation Office that Wagner was "sorry for going to DC and feels bad for what happened."  Presentence Report ("PSR") at 8.

As part of the investigation into Wagner's conduct, the FBI interviewed one witness who knows Wagner and who stated Wagner "always carries a handgun."  This same witness stated that on January 5, 2021, before leaving for Washington, Wagner discussed going to a shooting range in Indiana.  The witness also recounted that after Wagner returned to Indiana, he admitted "he thought he had crossed the line just by going into the Capitol building and that he 'made a mistake.'"[8]  The FBI also interviewed the other individual who traveled with Wagner and Tutrow

---

[8]  The quoted passages are from FBI's summary of the interview and are not necessarily verbatim statements.

to Washington on January 6.  That individual stated he observed two long-gun cases in the trunk of Wagner's car during the trip, but never saw any firearms, and did not believe Wagner took any guns to the Capitol.  A third witness the FBI interviewed knew that Wagner had inherited hunting firearms from his father and that Wagner has a firearms permit.[9]

Wagner knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On January 25, 2021, Wagner was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  He was arrested the next day.  On April 19, 2021, Wagner was charged by an Information with four counts that mirrored the violations listed in the Complaint.  On November 5, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G).  In his plea agreement, Wagner agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   <u>Statutory Penalties</u>

Wagner now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

---

[9] As alluded to during Tutrow's sentencing on December 21, 2021, Tutrow claimed in his postarrest interview that Wagner brought a pistol into the Capitol.  Due to credibility concerns with statements Tutrow made during his interview and the lack of other corroboration, the FBI could not substantiate Tutrow's claim.

For the reasons described below, a sentence of 30 days in custody, 36 months of probation, and $500 in restitution is appropriate in Wagner's case.

**IV.**     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

**A.  The Nature and Circumstances of the Offense**

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So too does the conviction Wagner now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

All defendants should be sentenced based on their individual conduct.  But this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances, and Wagner is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and smelled chemical irritants in the air.

13

Even before he got to the Capitol grounds, Wagner recorded others walking to the Capitol using truculent language and was aware some were carrying baseball bats. He described the people proceeding to the Capitol as a "Trump's army" and predicted to Tutrow, "[I]t's gonna get real."

When the Capitol came into view on Pennsylvania Avenue, Wagner mused about himself, Tutrow, and another individual with them walking on the "[f]loor on the Senate" and the impact that would have, imagining the Senators "would be scared." Regardless of whether he had any real intention or expectation of making it to the Senate floor, Wagner was fully aware of the simmering mood of the crowd approaching the Capitol and that a breach of the building was possible. He was an enthusiastic participant in that growing mob. When he got to the Capitol grounds, the unfolding riot did not faze him. After asking another man if he had been tear-gassed and that man replied, "Way down low on the steps," Wagner responded, "That's why I'm wearing my mask." When Tutrow reunited with him, Wagner asked if he had fought with police, an acknowledgement that Wagner knew officers were being assaulted at the Capitol.

While looking at a defendant's individual conduct, this Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these

factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Wagner personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants. Wagner's lack of violence and property destruction is the reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

The most troubling aspect of Wagner's conduct was his belligerent rhetoric and exhortations to others to continue the attack on the Capitol.  After a crowd sang the National Anthem facing a defensive line of officers on the Capitol grounds, rioters expressed their rage to the officers, with one calling them "fucking traitors."  He joined that din by shouting, "That's treason right there."  When people in the crowd appeared to be leaving the area, he beseeched them to "[h]old your positions.  We will lose our ground if . . . we keep retreating back.  We will occupy this ground for as long as we can."  On several other occasions, Wagner continued to implore others to hold their positions and not cede any ground.  He believed people leaving the grounds were "cowards" and "pussies."  When he encountered individuals in a fracas outside the Capitol, he told them the "enemy" was inside and if they wanted to fight, "you can go in there and fight."

Wagner was keenly aware that the officers defending the building were outnumbered and overwhelmed.  When Tutrow reunited with Wagner on the Capitol grounds and admitted he entered the Capitol, Wagner asked if he had fought the police.  When Tutrow confessed he brought a knife inside the Capitol and asked if he would get in trouble for that, Wagner was not in the least bit shocked or dismayed.  Rather, he matter-of-factly advised Tutrow not to get "grapple[d],"

15

because "[t]hey can't detain people because there's not enough cops to secure a perimeter." Wagner further voiced his disdain for the officers, telling Tutrow they were "traitors" for shooting another rioter inside the building. At another point as he trained his camera on a line of officers, Wagner shouted, "Tyranny right in front of my eyes."

Even more appalling, when Tutrow reunited with Wagner on the Capitol grounds, Wagner expressed his puzzlement that others had not brought "ARs and shit" to the Capitol. He expressed his belief—and worse, his desire—that with that kind of show of force, "we could literally take it over right now." At another point, Wagner opined to Tutrow that rioters "need[ed] to hold" because "I feel like people are gonna show up with weapons now."

Wagner did not confine his belligerent conduct to the Capitol grounds. At approximately 3:10 p.m., Wagner decided to unlawfully enter the Capitol by climbing in through a broken window next to the Senate Wing Door. He remained inside until approximately 3:35 p.m., when he exited through a broken window near that same entranceway, a total of about 25 minutes.

Inside the Crypt, an officer ordered Wagner to move to the center of the space. Wagner moved for a time and joined in a chant of "U.S.A.," then a chant of "fuck Joe Biden," which he loudly repeated at least five times. Wagner continued moving inside the Crypt and did not stay toward the center as the officer had directed. The officer again approached Wagner, ordering him a second time to move to the center of the Crypt. Wagner told him, "This is our house." The officer responded, "I'm asking you nicely." Wagner then moved toward the center and suggested that he and the other rioters "barricade[e]" that area "so they can't enter," presumably referring to the police.

As Wagner proceeded toward the exit at the Senate Wing Door, he questioned an officer whether he "was on our side" and not Congress' side. He suggested, without irony, that if the

officer was not on the rioters' side, the officer would flout his oath to "protect this country from enemies foreign and domestic."   As he approached the smashed-open window he climbed out of to exit the building, alarms were still blaring and shattered glass and debris lay about the floor. Outside the Capitol, he urged other rioters to enter the Capitol and "fight," presumably against the police.  He vowed, "I'm gonna come back," entreated others to "[h]old the perimeter" because he believed "Trump's calling the National Guard," and yelled repeatedly, "Let's stop paying our taxes."

After the FBI issued the BOLO requesting the public's assistance in identifying individuals who breached the Capitol on January 6, 2021, Wagner, through an attorney, contacted federal authorities and identified himself as someone who had entered the Capitol.  The attorney stated Wagner regretted his actions on January 6 and was willing to cooperate.  After returning to Indiana, Wagner also admitted to other individuals that he made a mistake and feels sorry for entering the Capitol.  While these admissions deserve some attention, Wagner's deliberate, prolonged conduct at the Capitol—replete with invective toward the police and combative calls to continue the assault on the building and those defending it—belies any suggestion that this was some temporary lapse of judgment.

Wagner preserved evidence, including videos at and inside the Capitol from his phone, and gave consent to the FBI to search the phone.  The FBI did not find evidence that he engaged in promotion of the Capitol riot on social media or elsewhere.  Before Wagner's arrest, his attorney also stated that Wagner would be willing to give a voluntary interview, though the FBI ultimately did not interview him.  On January 26, 2021, Wagner self-surrendered to the FBI in Indiana and was processed without incident.

Soon after the government tendered him a plea offer, Wagner, through his attorney, expressed a desire to take responsibility for his conduct and accepted the offer.  The government gives significant weight to his desire to resolve his case promptly.  However, his aggravating conduct—especially his enthusiasm for joining a violent riot, his belligerent rhetoric and exhortations at the Capitol, and the disdain he showed for the officers defending the Capitol— weigh strongly in favor of incarceration.  While his expressions of regret to others for entering the Capitol deserve some credit, they do not begin to make up for his sustained militant conduct outside and inside the building.  In addition, due to Wagner's comments about bringing "ARs and shit" and other weapons to the Capitol, and because other witnesses have known Wagner to possess firearms, the government strongly believes a significant term of probation, including a condition that he not be permitted to possess a firearm or ammunition for the duration of any term of supervision, is necessary.

Accordingly, the nature and circumstances of the offense establish the need for a sentence of incarceration here.

### B.  The History and Characteristics of the Defendant

As set forth in the presentence report, Wagner does not have a prior criminal conviction. PSR at 6-7.  He would have zero points if the Sentencing Guidelines applied to his offense of conviction. USSG   § 4A1.2(c)(2).  Accordingly, he would be in Criminal History Category I. USSG §§ 4A1.1, 5A. According to the Pretrial Services Agency, aside from missing one telephone check-in on May 29, 2021, Wagner has complied with all the conditions of his pretrial release since he was arrested.  PSR at 3.  This factor would favor a more lenient sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")

This factor also weighs in favor of incarceration for a defendant like Wagner, who proceeded to and entered the Capitol despite seeing a riot brewing, effectively urged others to continue their attack on the Capitol, appeared to desire that individuals show up with assault weapons because it would facilitate taking over the building, showed contempt for the law-enforcement officers defending the Capitol, and even mused loudly that he and the other rioters should stop paying their taxes.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[10] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at:
 https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated by many of the rioters to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See Hodgkins*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a strong need for specific deterrence here.  Wagner's use of combative rhetoric—even contemplating how the Capitol could be "literally take[n] . . . over right now" if others arrived with "ARs and shit" or other weapons—is deeply troubling.  Further, while he was preparing to and right after he did leave the building, he said would "be back" and was "gonna come back," apparently not dismayed by the violence and destruction around him.   While Wagner's prompt self-identification to federal authorities and expression of regret following the riot deserve some credit, the prolonged nature of his belligerent conduct at the Capitol demonstrates a strong need for his sentence to specifically deter him from committing future crime.

Both the need to deter generally and to deter Wagner specifically strongly favor incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful-entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress.[11]  Each offender must be sentenced based on his or his individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the

---

[11] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[12]

Indeed, this Court has admonished that it did not "want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth at sentencing).

Wagner has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. But the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

For one thing, although all the other defendants discussed below and in the attached table participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long the defendant remained inside, the nature of any statements the defendant made (on social media or otherwise), whether the defendant destroyed

---

[12] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

evidence of participation in the breach, *etc.*—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1364-65 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on codefendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law-enforcement officials, and a large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol-breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentences imposed on other individuals with no or minimal criminal histories who committed the same offense of parading, demonstrating, or picketing in a Capitol building under 40 U.S.C. § 5104(e)(2)(G). No previously sentenced Capitol-riot case contains the same balance of

aggravating and mitigating factors present here.   But the following three cases may serve as reference points.

First, in *United States v. Troy Williams*, 21-cr-00082 (CJN), Williams and his codefendant breached the Capitol twice, spending about nine minutes inside during their initial breach, and 8-18 minutes inside during their second breach.   Williams observed rioters confronting officers inside the Capitol, and when observing acts of apparent property destruction and theft, he commented, "[T]his is not right."   During the second breach, Williams recorded a video in which he told his codefendant that while "most" of the rioters inside the Capitol did not want to hurt anybody, the riot was intended "just to let them know that when push comes to shove, we will fight.   We will just walk into this bitch . . . .   Just showed them, this is a taste, and if things don't change, we'll make a change."   Williams also joined in chants with other rioters inside and outside the building, cheering on the rioters during their confrontations with chants of "fight for Trump!," "fight for us!," and "U.S.A.!"   After leaving the building a second time, Williams and his codefendant remained on the Capitol grounds even after learning a state of emergency had been declared for the District of Columbia, and did not leave the grounds until law enforcement had finally amassed the force to drive the rioters off the grounds on the evening of January 6.   The Court sentenced Williams to 15 days of intermittent incarceration as a condition of 36 months of probation.

Williams's conduct was comparable to but less severe than Wagner's. While Williams engaged in some more serious activity—such as breaching the Capitol twice, recording violent entry, destruction, and theft inside the building, and spending a longer time at the Capitol—he also engaged in similar conduct, such as invoking pugnacious rhetoric and joining chants in the building.   Wagner's conduct was more aggravating because his rhetoric was more violent—he

questioned why others were not bringing firearms and other weapons to the Capitol and encouraged others to remain and prolong the overall attack—and he did not show any of the onsite scruples that Williams, who acknowledged that what was occurring at the Capitol was "not right," did. His instigation of what could have become further violent clashes between rioters and police officers posed a more severe risk to everyone at the Capitol than Williams's activity. Further, Wagner expressed contempt for law-enforcement officers defending the building, something Williams did not do, and failed to obey one officer's direct command to remain in the center of the Crypt.

Second, in *United States v. Rasha Abual-Ragheb,* 21-cr-00043 (CJN), Abual-Ragheb engaged in violent rhetoric and spread false information about the 2020 election on social media before, on, and after January 6, 2021. On December 28, 2020, soon after she first heard about plans for an upcoming rally on January 6, she urged others on social media to bring firearms with them to Washington. After she arrived in Washington, she spent approximately 2½ minutes inside the Capitol. While inside, she posed proudly for a photograph, which she posted on social media later that night. She spent about 75 minutes on the grounds that day, at one point yelling in the direction of the building, "Fuck you, fuck you, we will hurt you!" After the riot, she announced on social media that she was ready to "burn" America, complained law-enforcement officers treated the Capitol rioters worse than "BIM [*sic*] [which] burned the country down," and boasted she had gotten "teargas[sed] and pepper spray[ed] but I made history." On January 9, 2021, she posted her belief that "after being in DC and a witness it [*sic*] the people are more angry[;] Civil War is coming and I will be happy to be a part of it." The Court sentenced Abual-Ragheb to 36 months of probation with two months of home detention.

Abual-Ragheb engaged in considerable social-media promotion of the riot, while Wagner did not. She expressed comparable belligerent rhetoric and anger about law enforcement, though most of her statements were made on social media. Wagner, on the other hand, conveyed his ire to the officers at the scene of the riot, and he directly incited others to remain at the grounds and "hold the perimeter," posing more of an immediate threat to the officers, Members of Congress, Capitol employees, and others who were imperiled that day. In addition, Abual-Ragheb spent only 2½ minutes inside the capitol, about one-tenth the time that Wagner spent inside. These factors warrant a more serious sentence for Wagner.

Third, in *United States v. Jackson Kostolsky,* 21-cr-00197 (DLF), Kostolsky entered the Capitol for only 10-13 seconds, but engaged in several instances of aggravating conduct. He scaled a wall to get to the Upper West Terrace after he saw others doing the same. He entered through the Parliamentarian Doors only 30 seconds after rioters breached them. Despite hearing an alarm blaring inside, he left only when the Capitol police yelled "get out." He proudly texted his friends that he scaled the wall, got tear-gassed, "caught a rubber bullet," went inside the Capitol, and saw windows being broken. In addition, Kostolsky told one person, "I had fun," and the politicians were "crawling in fear." During an interview with the FBI, he first denied entering the Capitol, but later admitted he did go in. He also deleted videos from his telephone. The Court imposed a sentence of 36 months of probation, including 30 days of home detention, and other conditions.[13]

The duration of Kostolsky's breach—one of the shortest of any Capitol rioter charged with unlawfully entering the building—is a factor that would support a more lenient sentence for him.

---

[13] The government notes that during the sentencing in *United States v. Brandon Straka,* 21-cr-00579, Judge Friedrich stated she believed she lacked authority to impose a sentence that included both incarceration and probation.

His conduct has some aggravating features that Wagner's does not: Kostolsky scaled a wall, expressed pride to others about breaching the building and incurring the police's force to quell the riot, and was not forthcoming with the FBI and deleted evidence.  His rhetoric about the politicians "crawling in fear" was similar to Wagner's rhetoric about how scared Members of Congress would be if he walked onto the Senate floor.  But Wagner's violent rhetoric, vitriol toward the police, and exhortations to others and his longer time spent inside the Capitol are much more aggravating than Kostolsky's and warrant a sentence of some incarceration in addition to probation.[14]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "'only one of several factors that must be weighted and balanced,'" and the degree of weight is "'firmly committed to the discretion of the sentencing judge.'"  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have

---

[14]  The government notes it recommended a sentence of 60 days of incarceration for Wagner's codefendant, Tutrow.  Several factors informed that recommendation. Along with making other misrepresentations, Tutrow lied when he stated he did not bring a weapon inside the Capitol during his postarrest interview with the FBI.  He minimized his conduct at the Capitol, including telling the FBI "I didn't know I was trespassing" when he entered the building.  And he accumulated a significant criminal history during the six years before his arrest last January, including one conviction for contributing to the delinquency of a minor that involved troubling conduct and one revocation of probation. ECF No. 43.  While Wagner's encouragement of others not to leave and truculent rhetoric at the Capitol are more aggravating than much of Tutrow's activity at the Capitol, Wagner's expressions of regret and lack of any criminal history are more mitigating.

imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

After a review of the applicable § 3553(a) factors, the government believes that a 30-day term of incarceration, 36 months of probation, and the agreed-upon $500 restitution is appropriate here.

## V.      Combining Incarceration and Probation

The sentence requested by the government—30 days of incarceration followed by 36 months of probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[15] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[16] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[15] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[16] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

    ii.  <u>Analysis</u>

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")

(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons.

First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 28-30 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

33

be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 30, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release

or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Wagner pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> ### b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.*

> #### i. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[17]

    ii.  <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[18]

---

[17] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[18] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI.    <u>Conclusion</u>

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, the factors support a sentence of incarceration.  Balancing these factors, the government recommends that this Court sentence Wagner to a split sentence of 30 days of incarceration, 36 months of probation—including a condition that Wagner not possess any firearm or ammunition for the duration of his probation—and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a significant term of incarceration as a consequence of his behavior, while recognizing his regret, cooperation, and early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Seth Adam Meinero*
        SETH ADAM MEINERO
        Trial Attorney (Detailee)
        D.C. Bar No. 976587
        United States Attorney's Office for the
          District of Columbia
        202-252-5847
        Seth.Meinero@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2022, I served a copy of the foregoing on all

parties to this matter as listed in the Court's Electronic Case Files system.

                    */s/ Seth Adam Meinero*
                    SETH ADAM MEINERO
                    Trial Attorney (Detailee)